## TITCOMB v. BILLINGS, OLCOTT & CO. et al.

United States District Court
S. D. New York.
March 7, 1952.

Bernard Remsen Millham & Bowdish, New York City (Richard F. Curran, Damian J. Spellman, New York City, of counsel), for plaintiff.

Rathbone, Perry, Kelley & Drye, New York City (Francis S. Bensel, W. Frederick Knecht, New York City, of counsel), for defendants John E. Davis, Thomas H. Hughes and Charles F. Hummel, co-partners doing business under the firm name and style of Billings, Olcott & Co., and John E. Davis, individually.

Battle, Levy, Fowler & Neaman, New York City (Robert E. Hoppman, New York City, of counsel), for defendant B. P. Elebash.

CONGER, District Judge.

This is an action by the plaintiff, as administrator c. t. a. of the goods, chattels and credits left unadministered of George E. Titcomb, deceased, against present and former members of the stockbrokerage firm of Billings, Olcott & Co.

The complaint contains two claims for relief; one for the recovery of moneys and securities belonging to the estate of George E. Titcomb, deceased; another in the alternative, for an accounting for such moneys and securities.

George E. Titcomb died a resident of Brooklyn on April 1, 1928 leaving a Last Will and Testament which was admitted to probate in the Surrogate's Court of Kings County on May 24, 1928. His widow, Anna G. Titcomb, was appointed Executrix on the same date.

The Will of the deceased provided that his widow should enjoy the income from the estate during her lifetime and that upon her death the principal should be divided equally among their three children, John H. Titcomb, Helen Titcomb Auchterlonie and George P. Titcomb.

The principal portion of George E. Titcomb's estate in New York consisted of common and preferred stocks.

On March 1, 1929, an account was opened with Billings, Olcott & Co. in the name of "Estate of George E. Titcomb" in which account the estate securities were deposited. Their value exceeded $62,000.

Through trading, apparently both by straight purchases and sales and on margin the estate was practically wiped out by December 31, 1931, at which time the account showed a long holding of 100 shares of Loew's, Inc., a 51/600th share of Electric Bond & Share, and a short holding of 33 Consolidated Gas Rights.

It appears that the decedent's son, John, not only advised his mother in connection with this account, but personally directed and authorized all the transactions therein on behalf of the Executrix.

There appears to be no doubt about the illegality of the mother's speculative activities with the estate property, nor that the defendants had full knowledge of the trust character of the property.

The defendants set up the statute of limitations and laches in their answers and it was agreed at pre-trial conference that these defenses should be disposed of before any other issues are tried.

The complaint was filed on March 22, 1948.

Between March 1, 1929, when the account was opened, and the end of 1931, the account was active. After that time, the account was dormant until January 7, 1938, when it was closed out by the delivery to Anna G. Titcomb of 100 shares of Loew's, Inc. and 51/600ths of a share of Electric Bond and Share and the sum of $84.38, representing the credit balance then on hand.

It appears that the Executrix delivered the 100 shares of Loew's to John, who presently possesses them along with 200 additional shares of such stock later acquired as a result of a three for one split.

The Loew's stock when so delivered was registered in the name of Billings, Olcott & Co., but endorsed in blank and remained so until it was surrendered to Loew's transfer agent by John H. Titcomb for transfer to his name on March 19, 1934. Until that time dividends had been paid to Billings, Olcott and remitted, after some accumulation, to the Executrix in February, 1940, and to John in January, 1941 and January, 1943.

The plaintiff's first claim for relief is one at law for money had and received, or for damages for an injury to property, i. e., a conversion. The period of limitation applicable is six years, New York Civil Practice Act, § 48(1) and former § 48(3).

The plaintiff's second claim is one in equity for an accounting for which the period of limitation is ten years. N.Y.C. P.A. § 53.

Except for the payment of dividends in 1940, 1941 and 1943, there was no transaction within ten years of the commencement of this action on March 22, 1948. Unless, therefore, the operation of the statute of limitations was suspended in some way, or the payment of the dividends has some special significance, it is plain that the claims are barred.

■■ The gravamen of both claims for relief consists of an alleged participation by the defendants in an alleged breach of trust by the Executrix of the Titcomb Estate. And it appears that the liability of a third party participator in a breach of trust arises when the acts complained of occur. Hart v. Goadby, 1911, 72 Misc. 232, 129 N.Y.S. 892; Brooklyn Bureau of Charities v. Manufacturers Trust Co., 1939, 257 App. Div. 858, 12 N.Y.S.2d 688 (2d Dept.); Guild v. Hopkins, 1946, 271 App.Div. 234, 63 N.Y.S.2d 522 (1st Dept.) affirmed 297 N.Y. 477, 74 N.E.2d 183; Lammer v. Stoddard, 1886, 103 N.Y. 672, 9 N.E. 328.

The plaintiff contends, however, that this rule is inapplicable here since the defendants are accountable as trustees of an express trust; and that in such a case the statute of limitations does not begin to run until the trustees repudiate the trust.

■ Actually, the arrangement present here is not generally thought of as an express trust. Such a trust is commonly the creature of an instrument and is manifested by an intention to create it. See Bogert, Trusts and Trustees, V. 1, § 1, V. 2, § 451; Restatement of Trusts, § 2; 2 Bouv. Law Dict. Rawle's Third Revision, p. 3328. A person dealing with a stockbroker is not as a general rule creating an express trust by such arrangement nor has he such intention.

Nevertheless, the plaintiff insists for the purpose of the statute of limitations that the defendants may be regarded as express trustees. He relies mainly on two cases for this proposition.

In Butler v. Foster, 156 Misc. 250, 281 N.Y.S. 435, affirmed, 1935, 246 App.Div. 680, 284 N.Y.S. 713 (4th Dept.) it appears that an executor and trustee of an estate dissipated the funds of the estate by speculating in the stock market in his name as executor through the defendant stockbrokers who had full knowledge of the illegality of the investments. Upon a motion to dismiss the complaint on the ground that the causes of action were barred by the statute of limitations the Court held that " * * * the defendants should be considered in equity as express trustees of an expressed trust, and in that event the statute of limitations does not protect them." 156 Misc. at page 251, 281 N.Y.S. at page 437. It appears from the opinion that the complaint contained an allegation of fraud but the Court's holding does not rest on that.

In affirming, the Appellate Division wrote:

"We think that sufficient is shown to constitute a cause of action when the complaint is liberally construed in favor of the pleader, and that it is an action against a trustee or agent acting in a fiduciary capacity, and that per-

sons against whom the defendants' wrong was done are not shown to have had actual knowledge of the facts upon which their right depends until after the death of the executor Costello and that the statute of limitations is not, therefore, a defense as matter of law." 246 App.Div. at page 680, 284 N.Y.S. at page 714.

The opinion of the lower Court in the Butler case cited Harrison v. Schultz, 1934, 240 App.Div. 13, 269 N.Y.S. 182 (1st Dept.) which is the second main case upon which the plaintiff relies.

In the Harrison case a trustee used the principal of the trust fund and accrued income to purchase real property, title to which was taken in the joint names of herself and her husband. The husband had full knowledge of the source of the money. Later he conveyed his purported interest to his wife, not as trustee, but in her individual name. He subsequently received the property under his wife's Will and conveyed it to a stranger. At no time did the trustee or her husband inform the beneficiary of the existence of the trust fund. In a suit by the beneficiary against the husband's administrators, the Court held that the complaint was not on its face barred by the statute of limitations, relying on an English case, Soar v. Ashwell, 2 Q.B. 390 (1893) to the effect that one who knowingly assists a nominated trustee in a fraudulent disposition of trust property will himself be regarded as an express trustee.

In the instant complaint it is alleged that the Executrix and the defendants " * * * wrongfully, willfully and fraudulently employed such money and securities in the opening of a margin account * * *."

It is highly questionable that the defendant's conduct constituted actual fraud but in any event, assuming that the authorities cited by the plaintiff properly apply to the circumstances here, there is one good reason why all but a small part of the claims should be barred.

■ The reason is well expressed in Bogert, supra, § 951, p. 202, as follows:

"During performance of the express trust there is no cause of action for breach and so the statute of limitations has no bearing on the rights of the cestui; but, if the trustee violates the trust *and the cestui knows of such conduct, or could have learned of it by the use of reasonable diligence,* the court will apply the statute of limitations which governs equitable causes of action or an analogous statute concerning legal causes of action." [emphasis added]

The Appellate Division gave expression to this rule in affirming the lower Court in the Butler case, supra. See also Van Suetendael v. Van Suetendael, 293 N.Y. 233, 56 N.E.2d 563.

■ It is undisputed that the estate was substantially dissipated by the end of 1931. It is plain from the evidence that the plaintiff and his sister were aware of the condition by 1932.

The plaintiff visited with John and his mother at that time and was informed by John that the estate was dissipated. The plaintiff testified that he did not inquire about the reason for such losses for even though he was interested he "was not interested to the point of demanding that a specific list be provided or anything of that sort." He assumed that the general market conditions accounted for the estate's depletion. His disinterest at learning that his father's estate had been wiped out is unusual. Moreover, his recollection of the circumstances appears faulty. He knew John had been handling the affairs of the estate and that he had been investing the assets. John testified that he informed the plaintiff at the time of the visit in 1932 that the "losses occurred as a result of the purchases and sales of securities."

Shortly thereafter the plaintiff took up residence with his sister in Detroit. On December 15, 1932, the plaintiff and his sister addressed a joint letter to Mr. Louis H. Pink, an attorney who had handled the affairs of the estate for their mother.

"Dear Mr. Pink,
"Knowing Father as you did and also being his legal advisor we are

turning to you for advice in a delicate situation which we believe needs immediate action.

"At the time Father's will was probated his estate amounted to approximately $60,000 in first grade securities. This sum was exclusive of the Pike Estate in California. Mother was appointed sole trustee of this sum with life right interest and upon her death the estate was to be divided into three equal parts.

"Mother gave Jack the power of attorney and he evidently reinvested a good part of the securities in common stocks. Recently thru casual conversation between George and Jack we learn the estate now totals approximately $7,000 divided as follows—A $4,000 down payment on a house in Montclair, 100 shares of Loews present day value 27-3/8 and $1,000 in the bank. It is evident Jack attempted to recover his losses by averaging his prices with additional shares covering the downward trend of the market. But even so we do not understand why everything has disappeared if outright purchases were made.

"Without upsetting Mother to an undue extent we feel that we should take the following steps

"1. Safeguard the balance of Father's Estate.

"2. Protect our interest in the Pike Estate.

"3. Secure an immediate accounting Father's trust now dissipated.

"4. Determine the legality of the handling of the estate and ascertain if it is possible to reclaim losses if procedure was illegal.

"5. Is Jack with Mother's power of attorney responsible to us for the handling of the estate or would Mother be involved even tho she had no knowledge of business procedure and relied entirely upon Jack's recommendations.

"A letter from you would be deeply appreciated because we both felt a trust fund was in the major secure from such loss. If you have a list of Dad's securities we would like a copy in our possession. Until we hear from you we will not approach the family because we have full confidence in your judgment.

"With the kindest regards to Mrs. Pink and the family

"We remain

Sincerely yours,
"Helen Auchterlonie
George P. Titcomb."

Mr. Pink replied to the above letter as follows:

"Mrs. Helen Auchtelonie
1675 Chicago Boulevard
Detroit, Mich.
Dear Helen:—

"I am very sorry to learn that there is trouble in the estate. The last thing we knew was that we had transferred all of the property to your mother as executrix, and supposed everything was going satisfactorily. I am more sorry for your mother than anyone. The rest of you have health and youth, and she will have to be more or less a pensioner all her life, which is not pleasant.

"It would be difficult to advise until I know more about the facts, but I would suggest that you have your mother call and see me without John at her earliest convenience so that I can have a frank talk with her.

"I should think that your mother ought to cancel the power of attorney to John immediately and agree not to take any further steps with regard to the property of the estate without your consent and George's. If John has speculated with the funds he certainly ought to turn over his share of the estate to you and your brother.

"The securities which were turned over to the Executrix are as follows:

10 shares Royal Bank of Canada
50 " California Petroleum Corporation
10 " Pref. Oklahoma Nat. Gas Corp.

10 " Common Oklahoma Nat. Gas Corp.

5 " Common McMyler Interstate Corp.

13 " Common Los Angeles Fire Alarm Corp.

15 " Common Canadian Bank of Commerce

50 " Common American Tel. & Telegraph Co.

25 " Pref. Chrysler Corp.

50 " Pref. Baltimore & Ohio Railroad

15 " Common Bailtimore & Ohio Railroad

25 " Pref. General Motors

5 " Common Union Pacific Railroad

"There was also your father's interest in the Caton Avenue mortgage.

"With best wishes,

Sincerely,"

However, the plaintiff and Helen did nothing about this until 1946 when they consulted a lawyer after the Executrix became incompetent. The reason was expressed by Helen in a letter to the plaintiff and his wife in 1946:

"Your mistake as well as mine was to ignore what was happening to the Estate but when we learned, it was too late and to protest would have involved Mother and put Jack out of circulation. My early protests were met with hysterics and I guess you met with the same defense."

I believe the defendants have clearly proven that the plaintiff and his sister knew, or could have learned by reasonable diligence, of the circumstances attending the dissipation of their father's estate as early as 1932 and that, therefore, the transactions prior to that time are barred by either the six year or the ten year statute.[1]

There is some dispute as to when the account was actually closed. I find it was closed in 1938 when the securities were turned over to the Executrix. The fact that the securities remained registered in the firm name is without significance since they were endorsed in blank and could have been transferred to her own name by the Executrix at any time.

 One other factor must be mentioned. While the Loew's stock remained registered in the firm name, the defendants received dividends on such stock. In 1940, they paid them to the Executrix. But in 1941 and 1943 they paid the dividends to John. Since the defendants knew that these were Estate funds and since there is no evidence that the plaintiff and his sister were aware of these specific transactions before 1946, it would seem that such claims are not barred by any statute of limitations. In this determination I am following the rule of the Butler case, supra, rather than that expressed in Hart v. Goadby, supra.

It is unnecessary to determine the defense of laches.

Settle order in accordance with the foregoing.

---

[1]. This finding obviates any necessity of determining whether the shorter statute controls under the concurrent remedy rule as illustrated in Keys v. Leopold, 241 N.Y. 189, 149 N.E. 828.